**Hassan ALSHEIK, Appellant–Defendant,**

v.

**Alice GUERRERO, Individually and as Administratrix of the Estate of Israel Arcuri, Deceased, Appellee–Plaintiff.**

No. 45A04–1011–CT–680.

Court of Appeals of Indiana.

Oct. 26, 2011.

Rehearing Denied Dec. 22, 2011.

David J. Beach, Kirk D. Bagrowski, Eichorn & Eichhorn, LLP, Hammond, IN, Attorneys for Appellant.

Timothy S. Schafer, Schafer & Schafer, Merrillville, IN, Attorney for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Hassan I. Alsheik, M.D. (Dr. Alsheik), appeals the jury's award of damages in the amount of $1,165,000 to Appellee–Plaintiff, Alice Guerrero, Individually and as Administratrix of the Estate of I.A., Deceased (Guerrero), following Guerrero's Complaint for medical malpractice.

We affirm in part, reverse in part, and remand for further proceedings.

### ISSUES

Dr. Alsheik raises three issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by admitting the evidence and results of a second autopsy which was performed by Guerrero's medical expert without prior notification to Dr. Alsheik;

(2) Whether the trial court abused its discretion when it allowed Guerrero's pathologist to testify as an expert witness; and

(3) Whether the trial court abused its discretion when it admitted the postmortem photographs of the thirteen-month-old victim into evidence.

On cross-appeal, Guerrero raises one issue, which we restate as: Whether the trial court erred by denying Guerrero's request for pre-judgment interest.

### FACTS AND PROCEDURAL HISTORY

I.A. was born on May 1, 1999 with an undescended left testicle. His pediatrician referred him to Dr. Alsheik, a urologist, for treatment. On June 5, 2000, when he was thirteen months old, I.A. underwent an orchiopexy surgery[1] performed by Dr. Alsheik at Community Hospital in Munster, Indiana. After the surgery, Dr. Alsheik told Guerrero that "there was a little complication." (Transcript p. 116). I.A. was discharged early in the afternoon of that same day.

The morning after the surgery, June 6, 2000, I.A. had a fever and was fussy. Guerrero noticed that his scrotum was swollen, there was redness around the bandage and reddish-brown seepage in the bandage. She contacted Dr. Alsheik's office around 1:30 p.m. Because Dr. Alsheik was in surgery, Guerrero talked to Mrs. Alsheik. According to Guerrero, Mrs. Alsheik told her not to touch the bandage and that antibiotics would be called in to her pharmacy. When Guerrero arrived at the pharmacy, she learned that no antibiotics had been called in. Guerrero denies that she was advised to take I.A. to the emergency room, as alleged by Mrs. Alsheik.

That night, I.A. went to bed at 9:30 p.m. and awoke at midnight for a bottle. At 3:30 a.m. on the morning of June 7, 2000, I.A. woke up with a temperature and was fussy. Guerrero fed him some applesauce and changed his diaper. She noticed that his scrotum was more swollen and redder around the bandage than before. I.A. woke up again at 6:30 a.m. He was grinding his teeth so Guerrero fed him a bottle. This was the last time Guerrero saw I.A. alive.

Guerrero awoke at around 7:45 a.m. I.A. was not moving and she noticed that there was brown vomit around his face. I.A. was rushed to the hospital; he was pro-

---

1. Orchiopexy is a procedure in which a surgeon fastens an undescended testicle inside the scrotum, usually with absorbable sutures. Encyclopedia of Surgery, *http://www.surgery encyclopedia.com/La-Pa/Orchiopexy.html* (last visited Sept. 27, 2011).

nounced dead at 8:16 a.m. The emergency room note documented that I.A. was "stiff with obvious rigor and lividity." (Appellant's App. p. 972). When Guerrero went to see her son once more, the large bandage which had covered the incision had been removed and she observed that it looked "very black, everything terrible." (Tr. p. 132). The coroner's investigator arrived at 9:19 a.m.

The following day, on June 8, 2000, the Lake County Coroner's pathologist performed an autopsy on I.A. after conducting a gross inspection of the body. He photographed the progression of the autopsy; he took tissue specimens from various organs, evaluated them under the microscope and preserved them. Despite being contacted by Dr. Alsheik, the coroner's pathologist did not dissect the surgical site. Based on his gross inspection, the coroner found that

> [t]here is a recent surgical incision wound which is closed and intact over the left inguinal area; and there is an ecchymosis and mild edema related to postoperative changes. There is ecchymosis related to postoperative changes over the scrotum which contains both testicles. There is also a small wound with sutures over the left side of the bottom of the scrotum.

(Appellant's App. p. 988). The cause of death was listed as "vascular collapse undetermined cause." (Appellant's App. p. 986).

On March 25, 2003, at Guerrero's request, pathologist James Bryant, M.D. (Dr. Bryant) performed a second autopsy on I.A.'s body. During the autopsy, Dr. Bryant focused his attention on the incision and surgical site of I.A.'s groin area. He found that the left spermatic cord was dislocated at a 90–degree angle, causing an

L-shaped "kink" in the cord, and which resulted in a loss of blood supply in I.A.'s left spermadic cord, tip of his penis, left testicle and scrotum leading the surrounding tissue to become necrotic. (Tr. p. 419). In light of I.A.'s surgery immediately prior to his death, Dr. Bryant opined that this kink could only have resulted from the placement of a suture by Dr. Alsheik at the time of surgery. He stated that "the left testicle died before [I.A.] actually died." (Tr. p. 426). Dr. Bryant concluded that I.A.'s cause of death was vascular collapse due to sepsis resulting from the infarction of the left spermadic cord, tip of I.A.'s penis, left testicle and scrotum. Dr. Bryant documented his findings in his report, took photographs during the autopsy, and took tissue specimens from both testicles.

On May 28, 2002, prior to the second autopsy performed by Dr. Bryant, Guerrero initiated a medical malpractice claim against Dr. Alsheik by filing her proposed complaint with the Indiana Department of Insurance. On November 30, 2005, the medical review panel unanimously concluded that

> [t]he evidence does not support the conclusion that [Dr. Alsheik] failed to meet the applicable standard of care as charged in the complaint regarding his surgery on the patient; however, there is a material issue of fact, not requiring expert opinion, hearing on liability for consideration by the court or jury as it related to the phone conversation between [Guerrero] and the office of [Dr. Alsheik] on September 6, 2000.

(Appellant's App. p. 1001).

On February 8, 2006, Guerrero filed her Complaint of medical malpractice against Dr. Alsheik and Community Hospital.[2]

---

2. On June 30, 2006, Community Hospital was dismissed with prejudice and is no longer a party to this cause.

Thereafter, on August 6, 2010, Dr. Alsheik filed a motion to dismiss, or in the alternative, to exclude the testimony of Dr. Bryant. In addition, he filed a motion to bar the admission of evidence resulting from the autopsy performed by Dr. Bryant as well as to exclude the admission of autopsy photographs. On September 3, 2010, Guerrero filed her response to Dr. Alsheik's motions. On September 9, 2010, after hearing oral argument on the motions, the trial court issued its order, denying Dr. Alsheik's motions. Prior to trial, Dr. Alsheik renewed his objections to the testimony of Dr. Bryant and the admission of autopsy photographs by filing a motion in limine. Again, the trial court denied his motions.

On September 27 through October 6, 2010, a jury trial was conducted. At the close of the evidence, the jury returned a verdict in favor of Guerrero in the amount of $1,165,000. On October 7, 2010, Guerrero filed her request for pre-judgment interest, to which Dr. Alsheik responded on October 14, 2010. On November 17, 2010, after a hearing, the trial court denied Guerrero's request for pre-judgment interest.

Dr. Alsheik now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION
## APPEAL

### I. *Second Autopsy*

I.A. died on June 7, 2000. The coroner's autopsy took place on June 8, 2000, listing I.A.'s cause of death as "vascular collapse undetermined cause." (Appellant's App. p. 986). Almost two years later, on May 28, 2002, Guerrero filed her proposed Complaint with the Indiana Department of Insurance. On March 25, 2003, while awaiting the findings of the medical review panel, Guerrero exhumed I.A.'s body and had a second autopsy conducted by her expert pathologist, Dr. Bryant, at which only Dr. Bryant and Guerrero's counsel were present. Four months later, on August 20, 2003, during the deposition of Dr. Alsheik, Guerrero "ambush[ed]" Dr. Alsheik with Dr. Bryant's report, concluding that I.A.'s death was the result of vascular collapse due to sepsis resulting from the infarction of the left spermadic cord, tip of I.A.'s penis, left testicle and scrotum. (Appellant's App. p. 530).

In his motion to dismiss prior to trial and numerous times throughout the trial proceedings, Dr. Alsheik unsuccessfully objected to the admission of evidence relating to the second autopsy. The overarching theme in Dr. Alsheik's objections centers on the claim that Dr. Bryant, with the aid of Guerrero, engaged in the intentional destruction of evidence when he performed his pathological examination and dissection of I.A.'s groin area and then intentionally concealed the results. He maintains that Guerrero's failure to notify him of the destructive testing "was not neglect or oversight; it was done intentionally to gain a tactical advantage." (Appellant's Br. p. 22). In essence, Dr. Alsheik's argument conflates two separate issues: (1) whether Guerrero was mandated to notify Dr. Alsheik prior to undertaking the second autopsy and (2) whether Dr. Bryant's autopsy amounted to spoliation of the evidence, requiring sanctions. We will analyze each contention in turn.

### A. *Notice*

 The discovery rules are designed to allow a liberal discovery process, the purposes of which are to provide parties with information essential to litigation of the issues, to eliminate surprise, and to promote settlement. *Rivers v. Methodist Hosps., Inc.*, 654 N.E.2d 811, 813 (Ind.Ct. App.1995). Due to the fact-sensitive nature of discovery matters, the ruling of the trial court is cloaked in a strong presumption of correctness on appeal. *Mutual*

*Sec. Life Ins. Co. by Bennett v. Fidelity and Deposit Co.,* 659 N.E.2d 1096, 1103 (Ind.Ct.App.1995), *trans. denied.* Therefore, our standard of review in discovery matters is limited to determining whether the trial court abused its discretion. *Richey v. Chappell,* 594 N.E.2d 443, 447 (Ind. 1992). This court will reverse only where the trial court has reached an erroneous conclusion which is clearly against the logic and effect of the facts of the case. *Ind. State Bd. of Public Welfare v. Tioga Pines Living Ctr., Inc.,* 592 N.E.2d 1274, 1276 (Ind.Ct.App.1992), *trans. denied.*

■ The evidence reflects that at the moment the second autopsy was performed, discovery by way of interrogatories and depositions was on-going between the parties. Specifically, Dr. Alsheik had "asked in discovery to produce all photographs and records." (Appellant's App. p. 528). Guerrero's responses "to all [his] requests" were submitted on March 17, 2003. (Appellant's App. p. 528). During Dr. Alsheik's deposition and in response to Dr. Alsheik's 'ambush' comment, Guerrero stated that "after doing the request, we realized the need to do [the second autopsy], which was done subsequent to that request." (Appellant's App. p. 528). The record is devoid of any evidence reflecting that Dr. Alsheik had requested to be notified of any intent to exhume and autopsy I.A.'s body prior to the second autopsy, nor does Dr. Alsheik present us with a motion for the trial court to issue a protective order pursuant to Ind. Trial Rule 26(C), requiring that a possible second autopsy could only be performed on specified terms and conditions. Because there was no existing defense interrogatory or protective order at the time of the second autopsy, we conclude that Guerrero was not required to provide Dr. Alsheik with notice of the autopsy.

■ Furthermore, we find the production of Dr. Bryant's autopsy report and materials to Dr. Alsheik timely. During the deposition of Dr. Alsheik on August 20, 2003, Guerrero's counsel announced that "after I read the autopsy report of the coroner and saw what a farce it was, we exhumed the body to show exactly what happened here" and proceeded to confront Dr. Alsheik with Dr. Bryant's findings. (Appellant's App. pp. 527–28). When Dr. Alsheik objected to not having seen Dr. Bryant's report and materials prior to the deposition, Guerrero responded that "[y]ou don't have to produce [ ] until after the deposition ... I'm producing them right now in the dep[osition] for you, so the Doctor doesn't alter or change his testimony." (Appellant's App. p. 532).

■ Although not conceded explicitly by Guerrero, it is clear that the autopsy performed by Dr. Bryant was conducted in anticipation of litigation and trial and as such, it had to be produced to Dr. Alsheik. Even though Guerrero had already responded in full to Dr. Alsheik's interrogatories prior to the second autopsy, Guerrero was under a mandate to supplement her original response. It is a general rule that a party who has responded to a request for discovery with a response that was complete when made, must seasonably supplement his response to include the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify and the substance of his testimony. *See* T.R. 26(E)(1)(b).

In *Pioneer Lumber, Inc. v. Bartels,* 673 N.E.2d 12, 16 (Ind.Ct.App.1996), *trans. denied*—a decision within the context of a compelled production of a surveillance tape depicting the victim of a traffic accident—we found that "[d]isclosure of the surveillance videotape [to the victim] after [the victim] has been deposed and prior to trial preserves the impeachment value of the videotape and allows [the victim] to obtain

the information necessary for effective cross-examination and to secure rebuttal testimony."

Mindful of the directives instilled by *Pioneer Lumber,* we find Guerrero's production of Dr. Bryant's report and materials timely. The second autopsy was disclosed on August 20, 2003 during Dr. Alsheik's deposition, thereby preserving its impeachment value. Because it was disclosed six years before Dr. Alsheik decided to depose Dr. Bryant and seven years before trial, it allowed Dr. Alsheik to investigate the report and materials and glean the necessary knowledge for effective cross-examination. Thus, we conclude that the trial court did not abuse its discretion.

### B. *Spoliation*

▮ Next, we turn to Dr. Alsheik's allegation that Dr. Bryant's autopsy resulted in the destruction or spoliation of evidence. Spoliation consists of "[t]he intentional destruction, mutilation, alteration, or concealment of evidence, usually a document. If proved, spoliation may be used to establish that the evidence was unfavorable to the party responsible." *Cahoon v. Cummings,* 734 N.E.2d 535, 545 (Ind.2000) (Citing BLACK'S LAW DICTIONARY 1409 (7th ed.1999)). In Indiana, the exclusive possession of facts or evidence by a party may result in an inference that the production of the evidence would be against the interest of the party which suppresses it. *Id.* While this rule will not be carried to the extent of relieving a party of the burden of proving his case, it may be considered as a circumstance in drawing reasonable inferences from the facts established. *Porter v. Irvin's Interstate Brick & Block Co., Inc.,* 691 N.E.2d 1363, 1365 (Ind.Ct.App.1998). Potent responses to spoliation also exist by application of Indiana Trial Rule 37(B) which authorizes trial courts to respond to discovery violations with such sanctions "as are just" which may include, among others, ordering that designated facts be taken as established, prohibiting the introduction of evidence, dismissal of all or any part of an action, rendering a judgment by default against a disobedient party, and payment of reasonable expenses including attorney fees. *Gribben v. Wal–Mart Stores, Inc.,* 824 N.E.2d 349, 351 (Ind. 2005).

▮ During the second autopsy, Dr. Bryant opined that Dr. Alsheik had sutured the spermatic cord while closing the incision during surgery, resulting in I.A.'s death. Dr. Bryant reached this conclusion by ruling out every other possibility which would have caused the kink in the spermatic cord. He noted "[t]hat's the only thing I can think of . . . [it is] consistent with a suture being placed too deep or angled wrongly or something." (Tr. p. 420). However, when Dr. Bryant performed the autopsy he could not find a suture actually wrapped around the spermatic cord because "in order to get into [the incision] he had to cut the sutures away that were there." (Tr. p. 419). Based on Dr. Bryant's actions and testimony, Dr. Alsheik now contends that Dr. Bryant spoliated the evidence because he removed sutures from I.A.'s body and failed to preserve any tissue specimens of I.A.'s penis and scrotum to support his conclusion that the penis and scrotum were necrotic.

We decline to find that Dr. Bryant intentionally destroyed evidence during the autopsy. Dr. Alsheik failed to establish that Dr. Bryant's destruction of the sutures was done for any reason other than the standard practice of investigative purposes, *i.e.,* opening up the incision wound during an autopsy to evaluate if anything had gone wrong during surgery. There is no evidence that Dr. Bryant's action was done negligently or intentionally to suppress the truth; rather, the opposite occurred: Dr. Bryant cut through the su-

tures to exclude any other possible cause of death than the one he opined. Moreover, during the autopsy, Dr. Bryant took photographs and tissue samples from both testicles. Guerrero disclosed these to Dr. Alsheik for evaluation by Dr. Alsheik's expert pathologist witness, Dr. Michael Kaufman (Dr. Kaufman). Based on his review of Dr. Bryant's report and materials, Dr. Kaufman reached the opposite conclusion—I.A.'s death was not the result of sepsis—and he vehemently denied the presence of necrosy. As such, it is clear that even assuming *arguendo*, Dr. Bryant spoliated the evidence, there appears to be no resulting prejudice requiring sanctions to be imposed on Guerrero as Dr. Alsheik's expert had an opportunity for a complete and detailed review of Dr. Bryant's opinions. Thus, we affirm the trial court.

## II. *Expert Witness Testimony*

 Next, Dr. Alsheik takes issue with the trial court's qualification of Dr. Bryant as an expert witness for Guerrero pursuant to the directives of Ind. Evidence Rule 702. Indiana Evidence Rule 702 defines the guidelines for admission of expert testimony as follows:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

The rule assigns to the trial court a gatekeeping function of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. *McCutchan v. Blanck*, 846 N.E.2d 256, 260–61 (Ind.Ct.App.2006) (quoting *Ly-tle v. Ford Motor Co.*, 814 N.E.2d 301, 309 (Ind.Ct.App.2004), *trans. denied*). As with the admission of other evidence, the trial court's determination regarding the admissibility of expert testimony under Rule 702 is a matter within its broad discretion and will be reversed only for abuse of that discretion. *See Lytle*, 814 N.E.2d at 309. When faced with a proffer of expert scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue. *Id.* Scientific knowledge admissible under Indiana Evidence Rule 702 connotes more than subjective belief or unsupported speculation. *Id.* Thus, expert testimony must be supported by appropriate validation or good grounds based on what is known, establishing a standard of evidentiary reliability. *Id.*

 Indiana's Evidence Rule 702 is not intended to interpose an unnecessarily burdensome procedure or methodology for trial courts. *Sears Roebuck & Co. v. Man-uilov*, 742 N.E.2d 453, 460 (Ind.2001). The adoption of Rule 702 reflected an intent to liberalize, rather than to constrict, the admission of reliable scientific evidence. *Id.* As the Supreme Court instructed in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Evidence need not be conclusive to be admissible. *Turner v. State*, 953 N.E.2d 1039, 1055–56 (Ind.2011). "The weakness of the connection of the item [of evidence] to the defendant goes toward its weight and not its admissibility." *Owensby v. State*, 467 N.E.2d 702, 708 (Ind.1984). Cross-examination per-

mits the opposing party to expose dissimilarities between the actual evidence and the scientific theory. *Turner*, 953 N.E.2d at 1055–56. The dissimilarities go to the weight rather than to the admissibility of the evidence. *Id.*

In the instant case, Dr. Alsheik disputes the admission of Dr. Bryant's testimony under each prong of Indiana Evidence Rule 702.

### A. *Indiana Evidence Rule 702(a)*

██ Pursuant to Ind. Evid. R. 702(a), two requirements must be met before a witness can qualify as an expert: (1) the subject matter must be distinctly related to some scientific field, business or profession beyond the knowledge of the average person and (2) the witness must have sufficient skill, knowledge, or experience in that area so that the opinion will aid the trier of fact. *Taylor v. State*, 710 N.E.2d 921, 923 (Ind.1999).

██ Guerrero's pathologist, Dr. Bryant, testified as to what caused the death of I.A. He explained to the jury that the "most common reason" to perform an autopsy "is a sudden and unexpected death, and either the coroner of that county wants to know what the cause of the death is …, or a family [ ] wants to know[.]" (Tr. pp. 399–400). Prior to testifying about his findings, Dr. Bryant elaborated on his qualifications as a pathologist. Specifically, he testified that after graduating from medical school at Loyola University in Chicago in 1974, he served a four year combined internship and residency in pathology at Rush–Presbyterian–St. Luke's Medical Center. Dr. Bryant became board certified in anatomic and clinical pathology in 1978 and licensed to practice medicine in both Illinois and Indiana. He stated that he had performed more than 4,000 autopsies and examined more than 200,000 surgical specimens. Dr. Bryant added that he is the director and/or clinical consultant for MedStar Laboratory and UNILAB, that he was on the faculty at Rush Medical College and was a lecturer in pathology at Indiana University. He has over forty-seven publications in academic peer-reviewed medical journals.

Dr. Bryant's testimony concerning I.A.'s autopsy and resulting cause of death was uncontrovertibly beyond the knowledge of the average juror. Dr. Bryant's extensive experience performing autopsies qualified him to offer an opinion about I.A.'s sudden death. Although we note Dr. Alsheik's argument that Dr. Bryant lacked knowledge about the precise surgical procedure of an orchiopexy and the basic anatomical structure of blood supply to the penis, testicles, and scrotum, we find that his contention more properly goes to the weight of Dr. Bryant's testimony rather than to his qualification as an expert pathologist.

### B. *Indiana Evidence Rule 702(b)*

██ When faced with a proffer of expert scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and reliable. *See Norfolk Southern Ry. Co. v. Estate of Wagers*, 833 N.E.2d 93, 103 (Ind. Ct.App.2005), *trans. denied.* Even though Dr. Alsheik bases his argument disputing the reliability of Dr. Bryant's scientific methodology on the four factors enunciated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Indiana's Evidence Rule 702(b) is different. Whereas the Indiana Rule mandates that expert scientific testimony is only admissible when the underlying scientific principles are reliable, its federal counterpart allows expert testimony based on "scientific, technical, or other specialized knowledge" only if "(1) the testimony is based upon sufficient facts

or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702.

■ While Indiana courts are not bound by *Daubert*, we have previously noted that the concerns driving *Daubert* coincide with the express requirement of Indiana Rule of Evidence 702(b) that the trial court be satisfied of the reliability of the scientific principles involved. *Malinski v. State*, 794 N.E.2d 1071, 1084 (Ind. 2003). Though we may consider the *Daubert* factors in determining reliability, there is no specific test or set of prongs which must be considered in order to satisfy Indiana Evidence Rule 702(b). *Turner*, 953 N.E.2d at 1055–56. We therefore find *Daubert* helpful but not controlling when analyzing testimony under Indiana Evidence Rule 702(b).

In the case at bar, Dr. Alsheik contests the scientific reliability of Dr. Bryant's opinion, which was largely based on the fact that Dr. Bryant "could not find anything else that could have caused I.A.'s death." (*See* Tr. p. 420). Both parties refer to *Myers v. Illinois Central R. Co.*, 629 F.3d 639, 644 (7th Cir.2010), in which the Seventh Circuit Court of Appeals found that "differential diagnosis[3] is an accepted and valid methodology for an expert to render an opinion about the identity of a specific ailment." The question here, however, is not the cause of I.A.'s suffering but rather what caused his death, and a better term to describe this is a "differential etiology." *Id.* In a differential etiology, the doctor rules in all the potential causes of a patient's ailment and then, by systematically ruling out causes that would not apply to the patient, the physi-

cian arrives at what is the likely cause of the ailment or death. *See id.* The *Myers* court concluded "[t]here is nothing controversial about that methodology. The question of whether it is reliable under *Daubert* is made on a case-by-case basis, focused on which potential causes should be ruled in and which should be ruled out." *Id.*

■ This is exactly what Dr. Bryant did. Guerrero requested Dr. Bryant to perform a second autopsy on I.A.'s body, with special focus on the incision site and surgery. Evaluating these areas, Dr. Bryant reached the conclusion that I.A.'s death was caused by sepsis. Turning to possible alternatives, Dr. Bryant ruled out aspiration, the cause of death proposed by Dr. Alsheik's expert pathologist. Dr. Bryant stated that "[i]t's common practice for all of us to look for that, especially if we're dealing with sudden, unexpected deaths." (Tr. p. 446). Therefore, we conclude that Dr. Bryant's scientific methodology in reaching his result rested on reliable scientific principles.

Nevertheless, Dr. Alsheik now complains that Dr. Bryant's evaluation did not follow the accepted methodology for conducting a pathological examination. To support his argument, Dr. Alsheik alludes to the fact that Dr. Bryant only took three photographs and preserved two tissue specimens whereas "the accepted protocol is to document significant findings photographically and preserve tissue specimens of all significant findings." (Appellant's Br. p. 33). Dr. Alsheik's argument is without merit when brought as an Ind. Evid. R. 702(b) issue. It is generally accepted that Ind. Evidence Rule 702(b) only pertains to the reliability of scientific principles, not to technical or other specialized

---

**3.** Differential diagnosis is "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." STEDMAN'S MEDICAL DICTIONARY 110620 (27th ed.2000)

knowledge. *See Malinski,* 794 N.E.2d at 1084–85. Here, Dr. Alsheik's claim references the accepted conduct and procedures to be followed during an autopsy, rather than a cluster of scientific principles. His contention relates to the credibility and weight of Dr. Bryant's testimony and is more appropriately reserved as fodder during the proverbial battle of the experts to be fought through their direct and cross-examination. In sum, we hold that the trial court did not abuse its discretion when it admitted Dr. Bryant as Guerrero's expert pathologist.

### III. *Admission of Autopsy Photographs*

Lastly, Dr. Alsheik focuses his attention on the trial court's admission of I.A.'s post-mortem photographs. Grouping the post-mortem photographs into three categories, Dr. Alsheik disputes the evidentiary value of (1) the photographs of the coroner's autopsy; (2) the photographs taken during Dr. Bryant's autopsy; and (3) a photograph of I.A.'s face taken one hour after his pronounced death. Although he raised several, recurring arguments within each category, we discern two main threads in Dr. Alsheik's contentions: (1) the photos were irrelevant and immaterial and (2) their admission amounted to reversible error because the gruesome character of the photos was prejudicial and affected his substantial rights.

### A. *Standard of Review*

■■■■ Because the admission and exclusion of evidence falls within the sound discretion of the trial court, we review the admission of photographic evidence only for an abuse of discretion. *Corbett v. State,* 764 N.E.2d 622 627 (Ind.2002). Relevant evidence, including photographs, may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* Gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe

orally. *Id.* Photographs, even those gruesome in nature, are admissible if they act as interpretative aids for the jury and have strong probative value. *Id.* Thus, the potential that passions may be aroused by the gruesomeness of the photograph is not sufficient grounds for exclusion if the photograph is material and relevant. *Eddy v. State,* 496 N.E.2d 24, 26 (Ind.1986).

■■■■ Autopsy photos often present a unique problem because the pathologist has manipulated the corpse in some way during the autopsy. *Corbett,* 764 N.E.2d at 627. Therefore, autopsy photographs are generally inadmissible if they show the body in an altered condition. *Id.* However, in *Swingley v. State,* 739 N.E.2d 132, 133–34 (Ind.2000), our supreme court recognized that "there are situations where some alteration of the body is necessary to demonstrate the testimony being given." In *Fentress v. State,* 702 N.E.2d 721 (Ind. 1998), the court held admissible two photographs that depicted the victim's skull with the hair and skin pulled away from it. Because the pathologist had explained what he had done and the alteration was necessary to determine the extent of the victim's injuries, the court found that "the potential for confusion was minimal" and that the probative value outweighed the prejudicial effect. *Id.* at 722. With these premises in mind, we now turn to the admitted photographic exhibits.

### B. *Photographs of the Coroner's Autopsy*

Without referencing any exhibit numbers or tailoring his claims to specific photographs, Dr. Alsheik makes the overall, generalized statement that because the photographs taken by the Lake County Coroner in the hospital's emergency room and at the morgue did not accurately represent I.A. prior to his death, they have no

probative value, are prejudicial, and should have been excluded.

Combing through the expansive record, it appears that four photographs were admitted through Guerrero's testimony: Exhibit 10 is a photograph of I.A. in the emergency room, showing the onset of rigor mortis; Exhibit 11 is a close-up of I.A.'s genital area; Exhibit 12 depicts the discoloration of I.A.'s testicles from a left angle; and Exhibit 13 is a photograph detailing the incision site with the bandage pulled back. All four photographs were taken by the coroner within one hour of I.A.'s death and both Guerrero and the coroner affirmed that the photographs truly and accurately depicted I.A. within ten minutes to one hour after he was pronounced deceased. At the same time, the trial court excluded two additional photographs which it found to be cumulative to the ones already admitted.

Exhibit 10, an emergency room photograph depicting I.A. and showing the onset of rigor mortis, was reviewed by Dr. Bryant during his testimony. After looking at the photos, he explained that

this is a photograph of the child shortly after he died. So it—what it shows is a bandaged inguinal incision. There's infarction of the scrotum. You can't really see the penis that well. But there's a lot of inflammation around the surgical site 'cause it's red.

(Tr. p. 431). Dr. Bryant clarified that the inflammation would also be consistent with infection. After being handed Exhibit 11—a close-up of the genital area—Dr. Bryant educated the jury that the photograph indicated that

the skin of the penis has blistered ... The blister is that little bubble that's on the end of the penis. [I]n postmortem jargon, we call that skin slippage, skin slippage and blistering, and it's a postmortem change that occurs—after some-

thing dies. So this tells me ... that his penis died before he did.

(Tr. p. 432). With respect to Exhibit 12—discoloration of the testicles from a left angle—Dr. Bryant found that

[W]e see the bandage, and there's some inflammation around it, but I think I see a second, maybe a second, —for sure it's—it's another blister. [ ] And then you can see the scrotum there ..., and it's black, and that's infracted scrotum we call that.

(Tr. p. 432). Turning to Exhibit 13—incision site with bandage pulled back—Dr. Bryant told the jury "[t]hey took most of the bandages off the incision site, and there's areas of black there, which look like they've died. And again, the scrotum is infracted." (Tr. p. 433). He concluded "[a]ll of this tells me that this organ died before he did, and then it is the-it became the cause of death." (Tr. p. 433).

 Therefore, Exhibits 10–13 were clearly relevant and material: they depicted what Dr. Bryant was permitted to testify to—the nature and cause of I.A.'s death—and as such function as interpretative aids to the jury. *See Askew v. State,* 439 N.E.2d 1350, 1353 (Ind.1982) ("The key test with respect to [autopsy] photographs is that of relevancy: that is, do the photographs depict objects or scenes which a witness would be permitted to describe"). Moreover, even if these exhibits could have been described as gruesome in nature, which they were not, their probative value is high and their admission did not prejudice Dr. Alsheik.

 In addition to those four exhibits, Dr. Alsheik focuses part of his attention on a photograph depicting I.A.'s larynx removed from his body. During trial, Dr. Alsheik presented his own theory of I.A.'s cause of death through the testimony of Dr. Kaufman, his expert pathologist. Dr. Kaufman opined that I.A. died from a lar-

yngospam, which is a clenching of the vocal cords causing asphyxia. Dr. Kaufman elaborated that I.A. "died of asphyxiation due to basically aspiration and choking on applesauce that he was eating very early that [ ] morning." (Tr. p. 1588). Guerrero rebutted this theory through Dr. Bryant, who ruled out Dr. Kaufman's suggested cause of death. Evaluating the photo of the larynx, Dr. Bryant stated "I don't see anything there blocking any of the area. The vocal cords look normal to me. So I don't think there's anything wrong with them." (Tr. p. 1765). He concluded that the photo does not support Dr. Kaufman's proposed cause of death. Clearly, the laryngospam as cause of death was placed before the jury by Dr. Alsheik, and Dr. Bryant relied on the photograph as an interpretative tool to explain his perceived defects in Dr. Kaufman's theory. Therefore, the photo was probative, not prejudicial, and properly admitted by the trial court.

C. *Photographs of Dr. Bryant's Autopsy*

Through the testimony of Dr. Bryant, the trial court admitted the photographs taken during Dr. Bryant's autopsy. Dr. Alsheik objected to their admission as having no probative value and being highly prejudicial.

Dr. Bryant testified that he performed, at Guerrero's request, a second autopsy on I.A.'s body almost three years after I.A. had died. During the autopsy, Dr. Bryant focused his attention on the incision and surgical site of I.A.'s groin area, which had not been investigated by the coroner during the first autopsy. He found that the left spermatic cord was dislocated at a 90–degree angle, causing an L-shaped "kink" in the cord which resulted in a loss of blood supply to I.A.'s left spermadic cord, tip of his penis, left testicle and scrotum and which led the surrounding tissue to become necrotic. (Tr.

p. 419). In light of I.A.'s surgery immediately prior to his death, Dr. Bryant opined that this kink could only have resulted from the placement of a suture by Dr. Alsheik at the time of surgery and concluded that I.A.'s cause of death was vascular collapse due to sepsis resulting from the infarction of the left spermadic cord, tip of I.A.'s penis, left testicle and scrotum.

The first photograph admitted by the trial court depicts I.A.'s embalmed and preserved body and shows the stitching of the first autopsy. Dr. Bryant used the exhibit to clarify the extent of the first autopsy and to support his statement that the first autopsy failed to investigate the incision site. The second photograph shows the opened incision site along with two probes manipulating the opening. Dr. Bryant explained that this photo indicates where he removed the spermatic cord, and shows the extent of infarction in the penis and scrotum. He elaborated that the penis and scrotum are far more deteriorated than the rest of the body since the embalming fluid could not reach them: "if you block off the blood supply for the blood, you're blocking it off also for the embalming fluid because the embalming is done through an artery." (Tr. pp. 1745–46). The third and final photograph depicts a comparison between the right and left spermatic cord. Dr. Bryant described the left as being abnormal because it was infarcted, whereas the right was normal. His only explanation for this difference was Dr. Alsheik's action of incorporating the left spermatic cord in his sutures causing death to the surrounding tissue.

Clearly, Dr. Bryant's autopsy photographs are relevant and material as they are interpretative tools, depicting what Dr. Bryant was allowed to testify to. *See Askew,* 439 N.E.2d at 1353; *Drollinger v. State,* 274 Ind. 5, 408 N.E.2d 1228 (1980) (Autopsy photographs are relevant to a

pathologist's explanations and findings regarding how he determined the cause of death). Dr. Bryant explained that I.A.'s body had been embalmed and also clarified the defects in the embalming process, which in turn supported his theory of I.A.'s cause of death.

Additionally, we conclude that the photographs' probative value outweighs the perceived prejudicial effect on Dr. Alsheik. Although it is generally accepted that autopsy photographs in which a pathologist distorts a victim's body parts are ordinarily objectionable; nevertheless, we confirm the trial court's admission of the second photograph. *See Cutter v. State*, 725 N.E.2d 401, 406 (Ind.2000) (holding that the distortion was the victim's body part was necessary to show the jury the largely internal injury). We accept here that the distortion was necessary to educate the jury on I.A.'s cause of death. *See id.* Therefore, the trial court did not abuse its discretion by admitting Dr. Bryant's autopsy photographs.

### D. *Photograph of I.A.'s Face*

During the proceedings, the trial court admitted a photograph of I.A.'s face taken by the coroner within one hour of I.A.'s pronounced death through Guerrero's testimony and over Dr. Alsheik's objection. Guerrero offered the photograph because it proved I.A. was "a perfectly healthy child. We do not have a lot of discoloration. We don't have abnormalities. This is a normal [ ] child here to show how he appeared." (Tr. p. 135).

In support of his argument that the trial court abused its discretion by admitting this photograph, Dr. Alsheik relies on *Evansville School Corp. v. Price*, 138 Ind.App. 268, 208 N.E.2d 689, 690 (1965), *reh'g denied*, where the trial court had admitted a photograph depicting the eleven-year-old deceased victim lying in his casket. The photograph showed the white satin interior of the casket and that portion of the body exposed to public view. *Id.* The photograph was not gruesome nor did it depict any physical markings, wounds, defects or other bodily abnormalities. *Id.* It was offered to show that the victim was a "nice looking and healthy chap" and to establish funeral expenses. *Id.* On appeal, we noted that "[i]t is difficult to see how [the photograph] could possibly be construed to establish the physical conditions and characteristics of this boy during his lifetime. This picture was not only taken after death, but also after the boy's body had been prepared for burial by a mortician." *Id.* at 691–92. Likewise, the court mentioned that it failed to see how the photograph would aid to prove that the parents incurred funeral expenses. *Id.* at 692.

Similarly, in the case before us, we fail to see how a photograph of I.A.'s face taken within one hour of his official death could establish that he was "a perfectly, healthy child." (Tr. p. 135). As such, the trial court abused its discretion in admitting the exhibit. However, the error will only amount to reversible error if it can be shown that the photograph substantially influenced the jury's verdict. *See Woods v. State*, 677 N.E.2d 499, 505 (Ind.1997). Here, it did not.

During her testimony, Guerrero told the jury about I.A. She painted a picture of a highly expressive, loved and lovable, happy little boy. He "was just an aura of the family. Everybody loved him." (Tr. p. 159). Guerrero explained how I.A. brought her and I.A.'s father back together again after his birth. She remembered how I.A. loved to play in his little basket, putting a pillow in it and laughing hysterically. He loved to play the piano, "hitting the piano," and posing for pictures. (Tr. p. 161). She recalled how I.A. first learned to walk and how he loved to walk down the walkway.

Describing her loss, she testified

I'll never be able to touch him again, hold him close to me, see him or smell him, how he smelled like a little baby, feel him, talk to him. I'll never be able to hear him call my name, and he went, "Ma Ma," or call his dad's name. He would say, "Da Da." And if we would walk away from him, he says, "Bye, bye, bye," saying bye-bye. I'll never know what he would look like up to now. I'll never know what he—how he would grow up to be.

(Tr. pp. 161–62). During her testimony, the trial court admitted family photos, depicting I.A. playing in his basket and playing the piano.

In light of Guerrero's very emotional testimony describing the joy brought by I.A. and the pain of her subsequent loss, together with the admission of family photos, we cannot conclude that the single admission of a photograph showing I.A.'s face, seemingly asleep and taken within one hour after his mother paid him her last farewell, would have substantially influenced the jury's verdict. Rather, it is the sensitive nature of the case—the sudden and unexpected death of a thirteen-month-old child—combined with a mother's testimony, speaking to her desperation, that undoubtedly influenced the jury. The trial court's erroneous admission of the photograph was harmless.

### CROSS–APPEAL

On cross-appeal, Guerrero contends that the trial court improperly denied her request for pre-judgment interest. Relying on *Tincher v. Davidson,* 784 N.E.2d 551 (Ind.Ct.App.2003), the trial court denied Guerrero's request, concluding that she had failed to file a written offer for settlement within the twelve months after the suit was filed.

Indiana's Prejudgment Act, Ind.Code ch. 34–51–4, allows a successful litigant to collect prejudgment interest, subject to certain restrictions. The statute provides that a successful plaintiff may not collect prejudgment interest if

(1) within one (1) year after a claim is filed in the court, or any longer period determined by the court to be necessary upon a showing of good cause, the party who filed the claim fails to make a written offer of settlement to the party or parties against whom a claim is filed;

(2) the terms of the offer fail to provide for payment of the settlement offer within sixty (60) days after the offer is accepted; or

(3) the amount of the offer exceeds one and one-third (1 1/3) of the amount of the judgment awarded.

I.C. § 34–51–4–6.

 The purpose of the Act is to encourage settlement and to compensate the plaintiff for the lost time value of money. *Johnson v. Eldridge,* 799 N.E.2d 29, 33 (Ind.Ct.App.2003), *trans. denied.* If a defendant has the option to terminate the dispute at a known dollar cost, and chooses not to do so, that defendant, and not the plaintiff, should bear the cost of the time value of money in the intervening period if the ultimate result is within the parameters set by the legislature. *Id.*

 We evaluate an award of prejudgment interest under an abuse of discretion standard. *Id.* The decision to award prejudgment interest rests on a factual determination and this court may only consider the evidence most favorable to the judgment. *Id.* An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id.*

 Guerrero filed her claim in court as well as with the Indiana Department of Insurance on May 29, 2002. The trial court subsequently dismissed the claim

without prejudice on January 9, 2003 because the medical review panel had not yet rendered an opinion. Thereafter, on April 21, 2003, Guerrero sent the following settlement letter to Dr. Alsheik:

As a follow-up to our telephone conversation, please be advised my client has authorized me to tender a settlement offer in the amount of the minimum structure of $250,000.00 with a present value of $187,001.00 which would qualify us to proceed into the Patients Compensation Fund pursuant to I.C. [§ ] 34–18–14–4. Would you kindly talk to Dr. Alsheik to obtain his consent and approval and in return, we will naturally agree to keep the terms of the settlement confidential so as not to cause any unnecessary embarrassment or inconvenience to your client.

You are hereby advised that said offer shall remain open for fifteen (15) days from the date of this letter and thereafter, will be withdrawn and not reinstated and we will proceed to a trial on the merits for the wrongful death of my client's minor son. I will await your response.

(Appellee's App. p. 46). On November 17, 2010, the trial court found this settlement letter to be insufficient to trigger the prejudgment interest requirements of the statute. Specifically, the trial court noted:

The Indiana [c]ourt of [a]ppeals, in *Tincher v. Davidson*, 784 N.E.2d 551 (Ind.Ct.App.2003), has stated that a "plaintiff does not qualify for prejudgment interest if ... within one (1) year *after* a claim is filed in the [c]ourt ... the plaintiff fails to make a written offer of settlement to the opposing party." (Emphasis in original). The Plaintiff's arguments regarding the application of that rule have some merit. However, a Plaintiff can avoid the application of that rule by making a written offer for settlement within the twelve months after a suit is filed. Since the Plaintiff did not do so in this case, *Tincher v. Davidson* bars the Plaintiff's claim for pre-judgment interest in this case.

(Appellee's App. p. 53).

In *Tincher*, a personal injury case, the injured party offered to settle all claims against Davidson for a definite amount. *Tincher*, 784 N.E.2d at 553. Davidson counter-offered a lower amount. *Id.* The day after filing the lawsuit, Tincher's counsel responded to the counteroffer by rejecting it "without counter." *Id.* Thus, although Tincher had made an earlier offer of settlement before the suit was filed, he did not revive it after filing the suit but instead outright rejected the counter-offer. *Id.* at 555–56. Based on these facts, the *Tincher* court declined to award prejudgment interest. *Id.* at 556. Guerrero distinguishes *Tincher* on its facts by asserting that *Tincher* involved a rear end auto accident case and not a medical malpractice claim. Relying on the statutory requirements of Indiana Code section 34–51–4–8 [4]

---

4. Indiana Code section 34–51–4–8 provides:

(a) If the court awards prejudgment interest, the court shall determine the period during which prejudgment interest accrues. However the period may not exceed forty-eight (48) months. Prejudgment interest begins to accrue on the latest of the following dates:
 (1) Fifteen (15) months after the cause of action accrued.

(2) Six (6) months after the claim is filed in court of [I.C. § ] 34–18–8 and [I.C. § ] 34–18–9 do not apply.
(3) One hundred eighty (180) days after a medical review panel is formed to review the claim under [I.C. § ] 34–18–10 (or [I.C. § ] 27–12–10) before its repeal.
(b) The court shall exclude from the period in which prejudgment interest accrues any period of delay that the court determines is caused by the party petitioning for prejudgment interest.

for accrual of prejudgment interest in medical malpractice cases, Guerrero contends that a claim brought under the provisions of the Medical Malpractice Act is vastly different from a personal injury claim: "[i]f a plaintiff is required to wait until suit is filed to make a demand in compliance with the Prejudgment Interest Statute, the plaintiff in a Medical Malpractice case will never be fully compensated since they are required to go through the prolonged medical review panel process prior to proceeding into court." (Appellee's Br. p. 32). Moreover, relying on the specific wording of I.C. § 34–51–4–6(1), Guerrero argues that the statute only sets a time limit by which time a plaintiff must make a demand and as such, Guerrero maintains that a plaintiff can make a demand any time prior to that time limit, including before a lawsuit is filed.

Like Guerrero, we find *Tincher* to be readily distinguishable from the case at hand. First, the facts of *Tincher* involved the validity of a written offer of settlement that rejected the defendant's counter-offer "without counter." *Tincher*, 784 N.E.2d at 555–56. And second, the *Tincher* court lists the requirements of I.C. § 34–51–4–6 without analyzing the language of subsection (1)—the language which is at the heart of the current dispute. *Id.*

We find our recent opinion in *Wisner v. Laney*, 953 N.E.2d 100 (Ind.Ct.App.2011) to be squarely on point to the situation at hand.[5] In *Wisner*, a medical malpractice cause, Laney requested prejudgment interest, which was denied by the trial court. *Id.* at 106. Similar to Guerrero, she cross-appealed the trial court's denial. *Id.* Laney had filed her original complaint with the trial court on November 26, 2002. *Id.* at 110. She then filed a written settlement offer on April 6, 2005, with terms similar to Guerrero's. *Id.* at 110–11. However, because Laney had yet to obtain a deter-

mination from the medical review panel, the trial court dismissed her complaint without prejudice. *Id.* at 111. On May 21, 2007, the medical review panel issued its determination and on August 6, 2007, Laney filed a renewed complaint with the trial court. *Id.*

Interpreting the time-requirement included in I.C. § 34–51–4–6(1), the *Wisner* court held

[t]here is nothing in the statutory language which mandates the trial court's interpretation that a written offer of settlement must be submitted after the filing of a lawsuit. Indeed, if the legislature intended the filing of the claim to be a controlling event, it could have stated that the written offer of settlement must be filed "at or after the filing of the claim and within one (1) year after the claim is filed in the court." We believe that it is more consistent with the intent of the statute to interpret the language "within one (1) year after a claim is filed in the court" as defining the deadline for the submission of a written offer of settlement, not as defining whether the settlement offer may be filed before or after the filing of a claim. In other words, the written offer of settlement may be submitted to the defendants before or after the filing of suit, but absent a showing of good cause for delay, it may not be submitted later than one year after the filing of suit.

*Id.* at 113.

We find *Wisner*'s reasoning well-taken and Dr. Alsheik fails to present us with any compelling argument to revisit *Wisner*'s interpretation of I.C. § 34–51–4–6(1). Therefore, because Guerrero made her written offer of settlement before the deadline of one year after the filing of her claim in the trial court, her request for

---

5. We note that counsel for *Laney* represents Guerrero in the case before us.

prejudgment interest should be honored. Accordingly, we reverse the trial court's order denying such interest and remand to the trial court for further proceedings to determine the appropriate amount of pre-judgment interest in this case.[6]

*CONCLUSION*

Based on the foregoing, we hold that (1) the trial court properly admitted the results of the second autopsy which was performed without notification to Dr. Alsheik; (2) the trial court did not abuse its discretion when it allowed Guerrero's pathologist to testify as an expert witness; and (3) the trial court did not abuse its discretion by admitting post-mortem photographs of the victim. On cross-appeal, we find that the trial court erred by denying Guerrero's request for pre-judgment interest and we remand to the trial court for determination of the pre-judgment interest.

Affirmed in part, reversed in part, and remanded for further proceedings.

NAJAM, J. and MAY, J. concur.

---

**6.** Although Guerrero makes an argument with respect to the specific language of the settlement offer, Dr. Alsheik does not dispute the sufficiency of that language to comply with I.C. § 34–51–4–6(2). As such, we will not evaluate the settlement language in light of the statutory provision.