# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**MICHAEL E. O'NEILL**
**RANDALL J. NYE**
**MICHELLE P. BURCHETT**
O'Neill McFadden & Willett, LLP
Dyer, Indiana

ATTORNEYS FOR APPELLEES:

**TIMOTHY S. SCHAFER**
**TODD S. SCHAFER**
**TIMOTHY S. SCHAFER, II**
SCHAFER & SCHAFER
Merrillville, Indiana



FILED

Oct 30 2012, 9:14 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARK CARTER and JOHN E. CARTER, Co-Personal Representatives of the Estate of JOHN O. CARTER, M.D., Deceased, | ) ) ) ) | |
| Appellants-Defendants, | ) ) | |
| vs. | ) ) | No. 45A05-1110-CT-563 |
| LORETTA ROBINSON, Individually and as Administratrix of the Estate of JOHN E. ROBINSON, Deceased, | ) ) ) ) | |
| Appellees-Plaintiffs. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Jeffery J. Dywan, Judge
Cause No. 45D11-0906-CT-108

**October 30, 2012**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendants, Mark Carter and John E. Carter, co-personal representatives of the Estate of John O. Carter, M.D., deceased (Dr. Carter), appeal the verdict in the amount of $550,0000 in favor of Appellee-Plaintiff, Loretta Robinson, Individually and as Administratix of the Estate of John E. Robinson, Deceased (Robinson), following Robinson's Complaint for medical malpractice.

We affirm.

## ISSUES

Dr. Carter raises three issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion when it allowed Robinson's pathologist to testify as an expert witness pursuant to Indiana Evidence Rule 702;

(2) Whether the trial court abused its discretion when it excluded the testimony of Dr. Carter's expert witness because he was not timely disclosed to Robinson; and

(3) Whether the trial court properly instructed the jury.

On cross-appeal, Robinson presents us with one issue, which we restate as: Whether Robinson is entitled to appellate attorney fees pursuant to Indiana Appellate Rule 66(E).

2

FACTS AND PROCEDURAL HISTORY

On December 2, 2002, sixty-one year old John Robinson (John) saw Dr. Carter with complaints of stress. John seemed nervous and anxious, stated that he heard noises in his head, and he was jerking his hand. Upon questioning, John told Dr. Carter that he had been in a motor vehicle accident two weeks earlier and had trouble sleeping. He did not complain of any shortness of breath, nor did Dr. Carter observe any. After a physical exam, Dr. Carter noted that John had puffy eyelids but his ears, nose, and throat appeared normal. His heart was in a regular sinus rhythm and Dr. Carter did not hear any gallop, murmur, or other abnormal sound. John's lungs were clear and he did not have any lower extremity edema or abnormal abdominal bloating. Dr. Carter diagnosed John with severe stress and insomnia and prescribed him Xanax and Ambien.

That afternoon, John died. At the time of his death, John and his wife, Loretta, had been separated and were living apart. Robinson had not seen her husband since the week before and did not know that he had consulted Dr. Carter earlier that day. Following John's passing, Robinson hired James Bryant, M.D. (Dr. Bryant) to perform an autopsy to determine the cause of John's death.

On December 5, 2002, Dr. Bryant conducted the autopsy. The clinical summary of the autopsy states:

> This patient was a 61 year old man who had high blood pressure, obesity problems and congestive heart failure. On the day of his death, he complained of shortness of breath and was shaking. He saw a physician who gave him Xanax and sent him home. He died at home a short time later. Other significant history includes obstructive sleep apnea and a recent auto accident with a fractured foot. There were no major surgeries or hospitalizations in the past.

(Exh. Tab 7, p. 1). During the autopsy, Dr. Bryant found fluid in John's chest cavities, in the heart cavity, and in the abdominal cavity. In addition, Dr. Bryant noted that the right atrium of the heart and its left and right ventricles were dilated, and the lungs, liver, and spleen showed fluid congestion. He concluded that John had died from acute and chronic congestive heart failure, which had been "ongoing for some time[,] probably longer than one day as judged by the extent of the fluid accumulation in the chest, heart, and abdomen and by the dilation of the left and right ventricles." (Exh. Tab 7, p. 7).

On October 26, 2004, Robinson filed a proposed complaint with the Indiana Department of Insurance alleging medical negligence and wrongful death against Dr. Carter. On November 3, 2008, the Medical Review Panel issued its conclusion with two members of the panel finding a material question of fact bearing on liability and with the third panel member finding that Dr. Carter had failed to comply with the appropriate standard of care. On January 20, 2009, Robinson filed her Complaint alleging medical malpractice by Dr. Carter which resulted in John's death.

On July 31, 2009, during the course of discovery, Robinson identified Dr. Bryant as an expert witness and on April 20, 2011, six weeks before the scheduled trial date, Dr. Carter deposed Dr. Bryant. On April 26, 2011, Dr. Carter unexpectedly died and the scheduled June 2011 trial was continued to September 26, 2011. On August 19, 2011, Dr. Carter's Estate filed a notice of amendment to his trial witness list, attaching the affidavit of Michael Kaufman, M.D. (Dr. Kaufman). Dr. Kaufman's affidavit addressed the scientific methodology underlying the conclusions reached by Dr. Bryant, stating

4

In my professional opinion, Dr. Bryant's conclusion that [John] died of "chronic and acute congestive heart failure" is scientifically unsound and unreliable because, in arriving at this conclusion, Dr. Bryant failed to rule out other possible competent causes for [John's] sudden death, including: a pulmonary embolism, a ruptured cerebral aneurysm, an acute myocardial infarction, a drug overdose or a hemorrhagic cerebral infarction. Without the autopsy slides and paraffin blocks from the autopsy, and a more through autopsy examination and toxicology screen, Dr. Bryant's conclusions regarding the cause of [John's] death cannot be tested or confirmed and other possible alternative competent causes of the death cannot be ruled out.

(Appellant's App. p. 390). Also that same day, Dr. Carter filed his motion to bar expert testimony of Dr. Bryant. On September 12, 2011, the trial court conducted a hearing on Dr. Carter's amended witness list and his motion to bar Dr. Bryant's testimony. The following day, the trial court rejected the addition of Dr. Kaufman as an expert witness and denied Dr. Carter's motion to bar Dr. Bryant's testimony. On September 20, 2011, Dr. Carter filed a motion to reconsider his request to add Dr. Kaufman as his witness; the trial court again denied his request.

On September 26-30, 2011, a jury trial was conducted. During trial, Dr. Carter renewed his objection to Dr. Bryant's testimony but the trial court sustained its earlier ruling and permitted Dr. Bryant to testify. Before Dr. Carter rested, he made an offer of proof on the proposed impeachment testimony that would have been offered by Dr. Kaufman. On September 30, 2011, the jury returned a verdict in favor of Robinson, awarding damages in the amount of $550,000.

Dr. Carter now appeals and Robinson cross-appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Indiana Evidence Rule 702*

Dr. Carter contends the trial court should have excluded Dr. Bryant's testimony as an expert witness for Robinson pursuant to the directives of Ind. Evidence Rule 702. Indiana Evidence Rule 702 defines the guidelines for admission of expert testimony as follows:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form or an opinion or otherwise.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

The rule assigns to the trial court a gatekeeping function of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. *McCutchan v. Blanck*, 846 N.E.2d 256, 260-61 (Ind. Ct. App. 2006) (quoting *Lytle v. Ford Motor Co.*, 814 N.E.2d 301, 309 (Ind. Ct. App. 2004), *trans. denied*). As with the admission of other evidence, the trial court's determination regarding the admissibility of expert testimony under Rule 702 is a matter within its broad discretion and will be reversed only for abuse of that discretion. *See Lytle*, 814 N.E.2d at 309. When faced with a proffer of expert scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue. *Id.*

6

Indiana Evidence Rule 702 is not intended to interpose an unnecessary burdensome procedure or methodology for trial courts. *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 460 (Ind. 2001). The adoption of Evid. R. 702 reflected an intent to liberalize, rather than to constrict, the admission of reliable scientific evidence. *Id*. As the Supreme Court instructed in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Cross-examination permits the opposing party to expose dissimilarities between the actual evidence and the scientific theory. *Turner v. State*, 953 N.E.2d 1039, 1055-56 (Ind. 2011). These dissimilarities go to the weight rather than to the admissibility of the evidence. *Id*.

Focusing on the second prong of the rule, Dr. Carter's main argument contests the methodology underlying Dr. Bryant's autopsy. Seizing upon a partial statement uttered by Dr. Bryant during *voir dire*, Dr. Carter contends that by simply stopping the autopsy investigation in the cause of death upon the discovery of the first possible cause of death, Dr. Bryant failed to adhere to the differential etiology methodology in which alternative causes of death are excluded. In a related argument, Dr. Carter alludes to the scientific foundational facts which serve as the basis of Dr. Bryant's opinion. Pointing to Dr. Bryant's reliance on the medical symptoms obtained from Robinson, from whom John was separated, and Dr. Bryant's lack of review of John's medical history prior to commencing the autopsy, Dr. Carter argues that Dr. Bryant's opinion with respect to

7

John's cause of death of congestive heart failure is not supported by reliable scientific facts. We will discuss each contention in turn.

A. *Methodology*

The brunt of Dr. Carter's contention is reserved for Dr. Bryant's methodology. When faced with a proffer of scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and reliable. *Alsheik v. Guerrero*, 956 N.E.2d 1115, 1126 (Ind. Ct. App. 2011). Scientific knowledge admissible under Evid. R. 702 connotes more than subjective belief or unsupported speculation. *Hannan v. Pest Control Services, Inc.*, 734 N.E.2d 674, 679 (Ind. Ct. App. 2000). Thus, expert testimony must be supported by appropriate validation or "good grounds" based on what is known establishing a standard of evidentiary reliability. *Id.*

Focusing on the lack of appropriate validation, Dr. Carter asserts that "[r]ather than conduct a systemic analysis (or any analysis) to determine the scientifically reliable cause of death, [Dr. Bryant] limited himself to identifying the first possible cause of death he came upon on gross examination of the chest." (Appellant's Br. p. 26). In support of his argument, Dr. Carter refers to Dr. Bryant's testimony during *voir dire* of his methodology. Specifically, when asked "that in arriving at a conclusion you stop your analysis of the – the analysis after you find the first possible cause of death[,]" Dr. Bryant responded, "That's correct. When I see a cause of death, that's what I conclude." (Tr. p. 725). Highlighting Dr. Bryant's answer, Dr. Carter maintains that Dr. Bryant failed to formulate a differential etiology to rule out other possible causes of death and as such,

8

"Dr. Bryant's methodology amounts to little more than unsubstantiated guesswork[.]" (Appellant's Br. pp. 29-30).

We recently discussed and adopted the methodology of a "differential etiology" in *Alsheik v. Guerrero*, 956 N.E.2d 1115 (Ind. Ct. App. 2011). Referencing *Myers v. Illinois Central R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010), we stated in *Alsheik* that "[i]n a differential etiology, the doctor rules in all the potential causes of a patient's ailment and then, by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment or death." *Alsheik*, 956 N.E.2d at 1127. "There is nothing controversial about that methodology. The question is whether it is reliable [] is made under a case-by-case basis, focused on which potential causes should be ruled in and which should be ruled out." *Id*. In essence, admissible expert testimony need not rule out all alternative causes, but where a defendant points to a plausible alternative cause and the doctor offers no explanation for why he or she has concluded that it was not the sole cause, that doctor's methodology is unreliable. *Henricksen v. ConocoPhillips Co*., 605 F.Supp.2d 1142, 1162 (E.D. Wash. 2009).

Looking at the totality of Dr. Bryant's testimony, we find that the autopsy report's cause of death was derived by employing the differential etiology method. During his testimony, Dr. Bryant concluded that

> I examined the body. I come to the conclusion that there's more than one finding of congestive heart failure, which I listed on the final pathological diagnosis below the diagnosis itself. There's right atrial dilation, passive congestion of the liver and the spleen, acute pulmonary edema and congestion, bilateral pleural effusion, peritoneal effusion, left ventricular dilation, right ventricular dilation. Those are all the anatomic findings that support my diagnosis of congestive heart failure.

(Tr. p. 853).  Besides the medical findings from his examination which correlated with a diagnosis of congestive heart failure, Dr. Bryant also looked at other possible causes and ruled those out.  Specifically, the following colloquy occurred between Robinson and Dr. Bryant:

[ROBINSON]:     You, in fact, ruled pulmonary emboli out.

[DR. BRYANT]:    Oh, I look for that.  That's one of the causes of sudden death.

[ROBINSON]:     And he talked about acute MI, or a heart attack?

[DR. BRYANT]:    I looked for that.  That's not –

[ROBINSON]:     You ruled that out, didn't you?

[DR BRYANT]:     Yeah.

* * *

[ROBINSON]:     You actually looked at all the coronary arteries?

[DR. BRYANT]:    Right.

(Tr. pp. 732-33).  In addition, Dr. Bryant testified that he checked the valves between the heart "for rheumatic fever and calcified valves that can affect the function of the heart." (Tr. p. 763).  He checked the trachea-bronchial tree leading to both lungs for obstructions as sudden aspiration can be one of the causes of sudden, unexpected death.  He checked the pancreas and alimentary tract, lymph nodes, and genitalia.  He also ruled out hepatitis, myocarditis, and pneumonia.

When being questioned about the possibility of John having incurred a cerebral aneurism, seizures or heart arrhythmia, Dr. Bryant responded that because of the nature of these potential causes, an autopsy could not detect these. Interrogated about the focal abnormality in the heart muscle, Dr. Bryant answered that the scarring damage was too small to contribute to a sudden heart attack.

In light of the totality of Dr. Bryant's testimony, it is clear that based on the medical findings, Dr. Bryant "reliably rule[d] out reasonable alternative causes" and excluded all of them, except one. *See Soldo v. Sandoz Pharmaceuticals Corp.*, 244 F. Supp.2d 434, 567 (W.D.Pa. 2003). As such, we conclude that his expert opinion is based on a proper use of the differential etiology methodology.

B. *Foundational Facts*

In a related argument, Dr. Carter asserts that Dr. Bryant's opinion on the cause of death is not supported by reliable facts. Specifically, Dr. Carter points to Dr. Bryant's reliance on Robinson's account of John's physical condition. Prior to commencing his autopsy, Dr. Bryant contacted Robinson, as John's wife, to get some background information on John's health. At that point, unbeknownst to Dr. Bryant, Robinson had been separated from John for a year and she had no personal knowledge of John's condition on the days before his death. During the interview, Robinson informed Dr. Bryant that John suffered from shortness of breath. Additionally, Dr. Carter alludes to the fact that Dr. Bryant performed the autopsy without consulting John's medical records, failed to order a toxicology study, and did not weigh the organs or measure bodily fluids during the autopsy but merely guessed their weight.

11

First, Dr. Bryant testified that he diagnosed John's cause of death based on his anatomic findings during the autopsy of the body, independently from and regardless of his interview with Robinson. Moreover, as we noted in *Alsheik,* Ind. Evidence Rule 702(b) only pertains to the reliability of scientific principles underlying an expert's opinion, not to technical or other specialized knowledge or observations. *See Alsheik*, 956 N.E.2d at 1127 (quoting *Malinski v. State*, 794 N.E.2d 1071, 1084-85 (Ind. 2003)). Here, Dr. Carter's claim in essence amounts to the accepted conduct and procedures followed during an autopsy, rather than a cluster of scientific principles. His contention relates to the credibility and weight of Dr. Bryant's testimony and is more appropriately reserved for cross-examination. *See Sears Roebuck and Co.*, 742 N.E.2d at 461 (Once the trial court is satisfied that the expert's testimony will assist the trier of fact and that the expert's general methodology is based on reliable scientific principles, then the accuracy, consistency, and credibility of the expert's opinions may properly be left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact.); *Person v. Shipley*, 962 N.E.2d 1192, 1198 (Ind. 2012) ("the dissimilarities between the actual weights and speeds of the vehicles [], and the [estimated] weights and speeds that [the expert] utilized in forming his opinion go to the weight and credibility of his testimony, not its admissibility."). In sum, Dr. Bryant's expert opinion on John's cause of death was derived through the application of the differential etiology methodology, a scientific reliable and valuable procedure, and the trial court did not abuse its discretion by allowing Dr. Bryant's testimony.

## II. *Dr. Carter's Expert*

Next, Dr. Carter asserts that the trial court abused its discretion when it excluded the testimony of his expert witness, Michael Kaufman, M.D. (Dr. Kaufman), who would have addressed the perceived flaws in Dr. Bryant's methodology, because of Dr. Carter's untimely disclosure of this witness. A trial court enjoys broad discretion in determining the appropriate sanctions for a party's failure to comply with discovery orders. *Vernon v. Kroger Co.*, 712 N.E.2d 976 (Ind. 1999). "Discretion is a privilege afforded a trial court to act in accord with what is fair and equitable in each case." *Id*. at 982. The trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances of the case, or if it misinterprets the applicable law. *Id*. at 976. One sanction available in cases where a party seeks to introduce evidence that violates the trial court's discovery rules is the exclusion of that evidence. *See Nyby v. Waste Management, Inc.*, 725 N.E.2d 905 (Ind. Ct. App. 2000), *trans. denied*. Absent clear error and resulting prejudice, the trial court's determinations with respect to violations and sanctions should not be overturned. *Id*.

Dr. Carter contends that the admissibility of Dr. Kaufman as an expert witness is to be analyzed in accordance with the principles set out in *Wiseheart v. State*, 491 N.E.2d 985 (Ind. 1985), where our supreme court outlined the factors appropriate for a trial court to consider in determining its course of action when a party seeks to use the testimony of a witness whose identity is disclosed to the opponent after discovery has been closed. These factors include:

(1) Whether the nature of defendant's violation was trivial or substantial. The trial court should consider when the witness first became known to defendant's counsel.

(2) How vital the potential witness' testimony is to the defendant's case. The trial court should determine the significance of the proffered testimony to the defense. Is the testimony relevant and material to the defense or merely cumulative?

(3) The nature of the prejudice to the State. Does the violation have a deleterious impact on the case prepared by the State?

(4) Whether the less stringent sanctions are appropriate and effective to protect the interest of both the defendant and the State.

(5) Whether the State will be unduly surprised and prejudiced by the inclusion of the witness' testimony despite the available and reasonable alternative sanctions (*e.g.,* a recess or a continuance) which can mitigate prejudice to the State by permitting the State to interview the witnesses and conduct further investigation, if necessary.

*Id.* at 991. In 2001, the *Wiseheart* standard was extended to civil cases by *Davidson v. Perron*, 756 N.E.2d 1007 (Ind. Ct. App. 2001).

Dr. Bryant's autopsy was initially disclosed on October 26, 2004, when Robinson commenced the lawsuit and it was included in the medical review panel's submission. The autopsy report merely detailed Dr. Bryant's findings and his diagnosis of the cause of death without specifying his underlying methodology. On July 31, 2009, Robinson identified Dr. Bryant as her expert witness. Throughout the proceedings, discovery was difficult and Dr. Carter had to resort to motions to compel discovery or to complete discovery requests on five separate occasions. Furthermore, despite eleven separate requests by Dr. Carter, Robinson did not make Dr. Bryant available for deposition until April 20, 2011, just six weeks before the scheduled trial. During the deposition, Dr.

14

Bryant was questioned at length about his methodology and procedures used during the autopsy. On April 26, 2011, Dr. Carter unexpectedly died and the trial court rescheduled the trial to September 26, 2011. In May of 2011, Dr. Carter consulted with Dr. Kaufman and hired him to evaluate Dr. Bryant's methodology and findings. On June 6, 2011, Dr. Carter's attorney filed his witness disclosure list with the trial court, notifying the trial court that he might call as a witness "any and all persons necessary for rebuttal or impeachment purposes whose identity cannot be reasonably ascertained at this time." (Appellant's App. p. 120). Dr. Carter did not disclose Dr. Kaufman at that time. On August 19, 2011, Dr. Carter filed a notice of amendment to his trial witness list, identifying Dr. Kaufman as a rebuttal witness to the expert testimony of Dr. Bryant, along with a motion to bar Dr. Bryant's testimony. Together with his notice of amendment, Dr. Carter filed Dr. Kaufman's affidavit, which stated

> In my professional opinion, Dr. Bryant's conclusion that [John] died of "chronic and acute congestive heart failure" is scientifically unsound and unreliable because, in arriving at his conclusion, Dr. Bryant failed to rule out other possible competent causes for [John's] sudden death, including: a pulmonary embolism, a ruptured cerebral aneurysm, an acute myocardial infarction, a drug overdose or a hemorrhagic cerebral infarction. Without the autopsy slides and paraffin blocks from the autopsy, and a more thorough autopsy examination and toxicology screen, Dr. Bryant's conclusions regarding the cause of [John's] death cannot be tested or confirmed and other possible alternative competent causes of death cannot be ruled out.

(Appellant's App. p. 390).

On September 7, 2011, Robinson filed an objection to add Dr. Kaufman as a witness and opposed barring Dr. Bryant's testimony. After a hearing on September 12, 2011, the trial court denied both of Dr. Carter's motions, concluding that:

> The defense has known for many months, perhaps years of [Robinson's] intention to call Dr. Bryant as a witness. The defense has also had the autopsy report and certificate of death containing Dr. Bryant's opinions. The late disclosure of Dr. Kaufman by the defense, coming just weeks before trial, would work an undue prejudice to [Robinson].

(Appellant's App. p. 18).

Applying the *Wiseheart* principles, we agree with the trial court's exclusion of Dr. Kaufman's testimony. While we disapprove of Robinson's delay in making Dr. Bryant available for deposition, it should be noted that Dr. Carter did not request the availability of Dr. Bryant for deposition until August 30, 2010—more than a year after Dr. Bryant had been disclosed as an expert witness for Robinson. Furthermore, even though the need for Dr. Kaufman's testimony became evident to Dr. Carter on April 20, 2011 and Dr. Carter hired Dr. Kaufman in May 2011, he failed to timely disclose Dr. Kaufman as his expert witness on June 6, 2011 but instead waited until approximately five weeks before trial to formally identify Dr. Kaufman and the content of his testimony. Although Dr. Kaufman's testimony was intended to place doubt on Dr. Bryant's methodology, during cross-examination of Dr. Bryant, Dr. Carter managed to achieve that exact result. Dr. Carter pointed out the weaknesses and perceived flaws within Dr. Bryant's methodology and foundational facts and placed those squarely before the jury. In sum, failing to find clear error and prejudice, we conclude that the trial court did not abuse its discretion when it excluded Dr. Kaufman as a witness and we will not interfere with that decision.

III.  *Jury Instruction*

Lastly, Dr. Carter contends that the trial court abused its discretion when it refused to tender his proposed instruction to the jury.  Specifically, Dr. Carter requested the trial court to give the jury the following final instruction:

> DEFENDANT'S FINAL JURY INSTRUCTION NO. 3
> You, the jury, are to determine whether [Dr. Carter] exercised reasonable care for a family practice physician in light of the conditions as shown by the evidence to have actually existed in 2002 when he was rendering care to [John].  This determination should not be based on hindsight.

(Appellant's App. p. 22).  Robinson objected to the inclusion of the last sentence, which was sustained by the trial court.  Consequently, the proposed instruction was read to the jury without reference to the use of hindsight.

Instructions serve to inform the jury of the law applicable to the facts presented at trial, enabling it to comprehend the case sufficiently to arrive at a just and correct verdict. *Blocher v. DeBartolo Properties Management, Inc*., 760 N.E.2d 229, 235 (Ind. Ct. App. 2001), *trans. denied*.  Jury instructions are committed to the sound discretion of the trial court.  *Id*.  In evaluating the propriety of a given instruction, we consider 1) whether the instruction correctly states the law, 2) whether there is evidence in the record supporting the instruction, and 3) whether the substance of the instruction is covered by other instructions.  *Id*.  An erroneous instruction warrants reversal only if it could have formed the basis for the jury's verdict.  *Id*.

The propriety of referencing the applicability of hindsight in jury instructions was first discussed in *Dahlberg v. Ogle*, 373 N.E.2d 159 (Ind. 1978).  In *Dahlberg*, the trial court tendered, over objection, a jury instruction which included an explicit hindsight

prohibition and which stated "[y]ou are to determine whether or not the defendant was negligent in one of the ways charged by the plaintiff upon the conditions as they existed in January 1971, as alleged by plaintiff. *You are not to utilize retrospection or hindsight.*" *Id*. at 164 (emphasis added). After reviewing this instruction, our supreme court stated:

> This instruction is not in a form which we would recommend. Nevertheless, its import is sufficiently clear and we do not believe it would have confused or misled the jury.

*Id.*

Here, the trial court sustained Robinson's objection to Dr. Carter's proffered instruction, which included the hindsight language now at issue, and declined to instruct the jury as to an explicit hindsight prohibition. We find no text in *Dahlberg* articulating a requirement for a hindsight jury instruction. Therefore, there was no error in the trial court's omission of the explicit hindsight prohibition from Final Instruction No. 3.

Nevertheless, even if there were error here, it would be harmless. Final Instruction No. 8 included the caution that:

> In providing health care to a patient, a family practitioner must use the degree of care and skill that a reasonably careful, skillful, and prudent family practitioner would use *under the same or similar circumstances*.

(Appellee's App. pp. 30-31) (emphasis added). As such, Final Instruction No. 8 included language similar in form and substance to the general prohibition on the use of hindsight found within the totality of Final Instruction No. 3.

18

CROSS-APPEAL

On cross-appeal, Robinson requests this court to award her appellate attorney fees pursuant to Indiana Appellate Rule 66(E), claiming that Dr. Carter's appeal was undertaken in bad faith. Indiana Appellate Rule 66(E) provides, in pertinent part, that we "may assess damages if an appeal . . . is frivolous or in bad faith. Damages shall be in the [c]ourt's discretion and may include attorney's fees." Our discretion to award attorney fees under this rule is limited, however, to instances when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay. *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). Additionally, while Indiana Appellate Rule 66(E) provides this court with discretionary authority to award damages on appeal, we must use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal. *Id.* A strong showing is required to justify an award of appellate damages and the sanction is not imposed to punish mere lack of merit but something more egregious. *Harness v. Schmitt*, 924 N.E.2d 162, 168 (Ind. Ct. App. 2010).

Indiana appellate courts have formally categorized claims for appellate attorney fees into substantive and procedural bad faith claims. *Id.* To prevail on a substantive bad faith claim, the party must show that the appellant's contentions and arguments are utterly devoid of all plausibility. *Id.* Substantive bad faith implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. *In Re Estate of Carnes*, 866 N.E.2d 260, 269 (Ind. Ct. App. 2007). Procedural bad faith, on the other hand, occurs when a party flagrantly disregards the form and content requirements of the rules of

19

appellate procedure, omits and misstates relevant facts appearing in the record, and files briefs written in a manner calculated to require the maximum expenditure of time both by the opposing party and the reviewing court. *Harness*, 924 N.E.2d at 168.

In her request for appellate attorney fees, Robinson relies on the substantive prong of the bad faith requirement, contending that "it is quite clear that Dr Carter simply made up preposterous arguments for the sole purpose of delaying payment to Robinson and causing Robinson and her counsel to expend the maximum amount of time and money in order to collect the compensation which she has been entitled to since December 2, 2002, the date of her husband's death." (Appellee's br. pp. 26-27). Robinson advances two instances of purported substantive bad faith: (1) a meritless appeal and (2) the omission in Appellant's Appendix of the June 6, 2011 witness disclosure list.

Although we ultimately find Dr. Carter's claims unpersuasive, however, because he supported his challenge with pertinent legal authority from which an argument could have been made and phrased it in a cogent manner, we do not find his contentions utterly devoid of all plausibility. His challenge is consistent with reasonable advocacy and we cannot find any evidence that Dr Carter deliberately presented such issues so as to delay Robinson's receipt of an award. We conclude that Dr. Carter's appeal possesses sufficient merit to withstand an award of attorney fees. Therefore, we deny Robinson's request for appellate attorney fees.

<u>CONCLUSION</u>

Based on the foregoing, we hold that (1) the trial court did not abuse its discretion when it allowed Robinson's pathologist to testify as an expert witness pursuant to Indiana

Evidence Rule 702; (2) the trial court appropriately excluded the testimony of Dr. Carter's expert witness because he was not timely disclosed to Robinson; and (3) the trial court properly instructed the jury.  With respect to Robinson's cross-appeal, we deny his request for appellate attorney fees pursuant to Indiana Appellate Rule 66(E).

Affirmed.

BAILEY, J. and CRONE, J. concur