**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**JEFFREY L. SANFORD**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TARRENCE LEE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 71A03-1301-CR-5 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable John M. Marnocha, Judge
Cause No. 71D01-1208-MR-11

June 12, 2013

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Tarrence Lee (Lee), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1(1).

We affirm.

## ISSUE

Lee raises one issue on appeal, which we restate as: Whether the trial court abused its discretion when it admitted the Chief Medical Examiner's testimony regarding the cause of death.

## FACTS AND PROCEDURAL HISTORY

Lee and Trina Winston (Winston) were married and had been living together in an apartment at the Hickory Village in South Bend, Indiana. On June 15, 2012, Winston filed a motion for a protective order against Lee; four days later, she filed for dissolution of marriage.

During the first week of August 2012, Winston was staying with Andre Banks (Banks). Banks considered Winston to be his "God sister." (Transcript p. 431). Winston lived with Banks whenever she needed a "safe place." (Tr. p. 431). While staying at Banks' residence, Banks noticed a bruise on Winston's neck. Winston explained the "abuse that she has been going through" and told him that Lee had tried to strangle her. (Tr. p. 441).

During the evening of August 15, 2012, Lee called Banks' home and asked to speak with Winston. After the phone call, at approximately 8:45 p.m., Winston exited

the house and left with Lee in Lee's vehicle. At approximately midnight, Winston entered Banks' house, while Lee waited outside in his car. A couple of minutes later, Winston left again, entered Lee's car, and drove away with him.

The next day, on August 16, 2012, at about 4:30 p.m., Lee arrived at his brother, Anthony Lee's (Anthony), place of employment. After Anthony finished work, Lee, Anthony, and Anthony's friend, Andre O'Neal (O'Neal), left in Lee's vehicle. While driving, Lee requested Anthony's and O'Neal's help in "disposing a body." (Tr. p. 169). When Lee elaborated that he had killed Winston, the two others started laughing, to which Lee responded, "no, for real." (Tr. p. 170). The three men then picked up their friend, James Johnson (Johnson). After picking up Johnson, Lee again mentioned disposing of Winston's body. He told the three men that he had picked up Winston at another man's house and that he believed she had been committing adultery. The three passengers still thought Lee was joking.

Eventually, Lee and the three men drove to Lee's apartment. When they entered Lee's apartment, Lee lit a candle, uncovered a body, and stated "[s]ee, I'm not playing." (Tr. p. 186). Anthony, O'Neal, and Johnson recognized Winston and saw that she was dead. O'Neal could tell that her body was "stiff" and "pale looking." (Tr. pp. 186, 190). None of the three men noticed any signs of blood or injuries. Lee handed Anthony the key to open his car's trunk and announced that "we're about to take her down, take her down and go get rid of her." (Tr. p. 188). While Lee and Johnson were carrying Winston's body down the stairs, her arm fell out of the blanket that was wrapped around her body. When he noticed Winston's uncovered arm, Lee said, "so, you still going to be

3

complicated." (Tr. p. 257). After they placed Winston's body in the trunk of Lee's vehicle, O'Neal began to walk away. Lee pulled up beside O'Neal and ordered him to get in the car. When O'Neal refused, Lee told him, "well, you going to be like her." (Tr. p. 195). O'Neal called 911 twice that night but his call was re-routed.

On August 18, 2012, O'Neal again called 911 to report Winston's body. South Bend Police Department Detective Anthony Bontrager (Detective Bontrager) spoke with O'Neal, Johnson, and Anthony to learn more about Winston's disappearance and the location of her body. The Detective and the three men made five unsuccessful trips in an attempt to discover where Lee had discarded Winston's body. On August 20, 2012, the State filed an Information charging Lee with murder, a felony, I.C. § 35-42-1-1(1).

Annette Steele (Steele) lived next door to 9120 South Harper, an abandoned property, in Chicago, Illinois. Steele first noticed a pungent odor around August 25, 2012, which lasted through September 1 before subsiding. On October 23, 2012, a Commonwealth Edison meter reader discovered a decomposed body behind the house and underneath discarded tires at 9120 South Harper. The body would later be identified as Winston. Dr. Stephen Cina (Dr. Cina), the Chief Medical Examiner for Cook County, Illinois, performed an autopsy and determined the cause of death to be homicide by unspecified means.

On November 14, 2012 through November 15, 2012, the trial court conducted a bench trial. At the close of the evidence, the trial court took the matter under advisement. Thereafter, on November 21, 2012, the trial court found Lee guilty as charged. On

4

December 21, 2012, during a sentencing hearing, the trial court sentenced Lee to an executed term of sixty-five years.

Lee now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

Lee contends that the trial court should have excluded Dr. Cina's testimony as an expert witness for the State pursuant to the directives of Ind. Evidence Rule 702. Indiana Evidence Rule 702 defines the guidelines for admission of expert testimony as follows:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

The rule assigns to the trial court a gatekeeping function of ensuring that an expert's testimony rests both on a reliable foundation and is relevant to the task at hand. *McCutchan v. Blanck*, 846 N.E.2d 256, 260-61 (Ind. Ct. App. 2006). As with the admission of other evidence, the trial court's determination regarding the admissibility of expert testimony under Rule 702 is a matter within its broad discretion and will be reversed only for abuse of that discretion. *Carter v. Robinson*, 977 N.E.2d 448, 452 (Ind. Ct. App. 2012).

Indiana Evidence Rule 702 is not intended to interpose an unnecessary burdensome procedure or methodology for trial courts. *Id.* The adoption of Evid. R. 702 reflected an intent to liberalize, rather than to constrict, the admission of reliable

5

scientific evidence. *Id*. As the Supreme Court instructed in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 496, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Cross-examination permits the opposing party to expose dissimilarities between the actual evidence and the scientific theory. *Turner v. State*, 953 N.E.2d 1039, 1055-56 (Ind. 2011). These dissimilarities go to the weight rather than to the admissibility of the evidence. *Id*.

Focusing on the second prong of the rule, Lee's main argument pertains to Dr. Cina's methodology in reaching his ultimate determination of Winston's cause of death. Because Dr. Cina categorized Winston's death as "homicide by unspecified means" based on the condition of her body and the lack of any anatomical findings indicating a cause of death, Lee maintains that Dr. Cina's opinion is based on speculation rather than scientific principles. (Tr. p. 25).

When faced with a proffer of scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and reliable. *Alsheik v. Guerrero*, 956 N.E.2d 1115, 1126 (Ind. Ct. App. 2011), *rev'd on different grounds*, 979 N.E.2d 151 (Ind. 2012). Scientific knowledge admissible under Evid. R. 702 connotes more than subjective belief or unsupported speculation. *Hannan v. Pest Control Services, Inc*., 734 N.E.2d 674, 679 (Ind. Ct. App. 2000). Thus, expert testimony must be supported by appropriate validation

or "good grounds" based on what is known establishing a standard of evidentiary reliability. *Id.*

During the trial, Dr. Cina testified that in determining a cause of death, all medical examiners and forensic pathologists rely on the autopsy and the investigative findings. Dr. Cina defined cause of death as "the disease or injury which started the train of events which ultimately led to a person's death." (Tr. p. 17). Turning to his examination of Winston's body, Dr. Cina followed this standard procedure, as well as the national guidelines and the State of Illinois guidelines. Prior to commencing the autopsy, Dr. Cina was briefed by officers about how Winston's body was found and was provided with crime-scene photographs. Upon examining the body, Dr. Cina found it to be in "a state of severe decomposition with partial skeletonization." (Tr. p. 19). Dr. Cina testified that this decomposition was consistent with a time of death of August 16, 2012. After his external and internal examinations, Dr. Cina opined the cause of death to be "homicide by unspecified means." (tr. p. 20).

Clarifying his determination, Dr. Cina told the trial court that homicide by unspecified means:

> means that we look at the totality of the situation. There is a body in an unusual place, there's an advanced state of decomposition. . . . We don't see any evidence of penetrating injury or blunt force injury to account for death, but we have a badly decomposed body somewhere where it really shouldn't be, and it didn't get there by itself. Putting all these factors together and then looking at the investigative history and specifics of that case, you have a couple of choices. Some medical examiners would default to asphyxiation and call it homicide in those cases. I believe the minority would call it undetermined. And then the other option is homicide by unspecified means. Which means that somebody killed this person and dumped them there and buried them in tires, but we don't have an anatomic

7

finding to say exactly what mechanism happened. . . . When I finalize this, if I call it homicide by unspecified means, I would go into that many of these cases are asphyxia in nature. It could be smothering, it could be ligature strangulations, it could be a plastic bag placed over the head, it could be a hand placed over the mouth and nose. . . . What I don't have is any injuries to the ribs or to the head to indicate a gunshot wound. Although a gunshot wound can injure the soft tissues only, so I can't exclude that. I don't have a knife mark on the ribs or the vertebrae of the neck or on the face or on the head. So I can't document that a stab or cut took place. On the other hand, if you just slash someone's throat and don't hit bone, I can't rule out that possibility either. . . . But in an asphyxia death, possibly the only finding you would have would be an injury to the hyoid bone or small bone to the neck. And we believe we recovered a fragment of hyoid bone, only about a third of it, but the anthropologists are still looking at that. So basically, when you've gone through that thought process you have a body that is dumped and buried under tires, several hours from where it should be. And to me the investigation suggests that a homicide is likely, based on the fact that there has been a prior incident of aggression towards this person, that to me gets it to homicide [] by unspecified means.

(Tr. pp. 22-25). Thus, based on this methodology as well as his own observations, Dr. Cina systematically ruled out potential causes of death and then arrived at the likely cause of death. As we noted in *Carter*, there is nothing controversial about that methodology. *Carter*, 977 N.E.2d at 452. The question whether it is reliable is made on a case-by-case basis, focused on which potential causes should be ruled in and which should be ruled out. *Id*. Here, we find Dr. Cina's determination of Winston's cause of death to be scientifically valid and reliable.

In an attempt to exclude Dr. Cina's testimony, Lee argues that Dr. Cina used improper "propensity evidence that the trial court ruled inadmissible in reaching his opinion." Upon review of Dr. Cina's testimony, we note that even if the doctor

mentioned propensity evidence, Lee failed to object at trial and therefore, waived the argument. *See Orta v. State*, 940 N.E.2d 370, 376 (Ind. Ct. App. 2011), *trans. denied*.

In sum, based on the totality of the evidence before us, we conclude that Dr. Cina's testimony was based on reliable scientific principles. As such, the trial court properly admitted the testimony of the expert witness pursuant to Evid. R. 702.

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly admitted Dr. Cina's expert testimony on Winston's cause of death.

Affirmed.

BRADFORD, J. and BROWN, J. concur